UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CLARA HUGHES,

       Plaintiff,                                  Hon. Janet T. Neff

v.                                                            Case No. 1:08-CV-700

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.

_____/

## REPORT AND RECOMMENDATION

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive. Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **affirmed**.

## **STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial

interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 46 years of age at the time of the ALJ's decision. (Tr. 28). She successfully completed high school and subsequently received nurses aide training. (Tr. 155). Plaintiff worked previously as an in-home care provider, packer, and retail clerk. (Tr. 157, 161-67).

Plaintiff applied for benefits on August 6, 2004, alleging that she had been disabled since May 24, 2002, due to weakness, migraines, high blood pressure, acid reflux, and knee pain. (Tr. 131-37, 149). Plaintiff's applications were denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 31-99, 221-30). On June 28, 2007, Plaintiff appeared before ALJ James Prothro, with testimony being offered by Plaintiff and vocational expert, Paul Delmar. (Tr. 934-66). In a written decision dated October 22, 2007, the ALJ determined that Plaintiff was not disabled as defined by the Social Security Act. (Tr. 15-29). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 6-9). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## RELEVANT MEDICAL HISTORY

On May 31, 2002, Plaintiff reported to the emergency room, complaining of generalized weakness. (Tr. 231-44). A CT scan of Plaintiff's brain was "normal." (Tr. 241, 244). X-rays of Plaintiff's chest revealed no evidence of abnormality. (Tr. 242-43). Plaintiff participated in an EKG examination, the results of which were "normal." (Tr. 232). Various laboratory tests were performed, the results of which were within normal limits. (Tr. 232). Plaintiff was prescribed aspirin and discharged home. (Tr. 232). On June 5, 2002, Plaintiff participated in an electroencephalogram, the results of which were "normal." (Tr. 245).

On November 25, 2002, Plaintiff was examined by Dr. Andrew Ramsahoi. (Tr. 352-54). Plaintiff reported that she was experiencing weakness in her left upper extremity. (Tr. 353). An examination of Plaintiff's upper extremities revealed no evidence of joint deformity, effusion, or tenderness. (Tr. 352). Plaintiff exhibited good range of motion in her shoulders. (Tr. 352). Plaintiff's gait was "unremarkable" and she exhibited no indication of distress. (Tr. 352, 354). The results of a neurologic examination were unremarkable and Plaintiff exhibited 5/5 grip strength. (Tr. 352). X-rays of Plaintiff's cervical spine revealed "mild degenerative changes." (Tr. 358).

On December 14, 2002, Plaintiff participated in an MRI examination, the results of which revealed "mild degenerative changes" with no evidence of stenosis, herniation, or spinal cord compression. (Tr. 356).

On January 3, 2003, Plaintiff was examined by Dr. Leslie Pelkey. (Tr. 350-51). Plaintiff reported that she was experiencing pain and numbness in her left upper extremity. (Tr. 350). The results of a physical examination were unremarkable and Plaintiff was instructed to take ibuprofen. (Tr. 350). X-rays of Plaintiff's knees were also "negative." (Tr. 289).

On February 27, 2003, Plaintiff was examined by Physician's Assistant Vincent Hogan. (Tr. 341). Plaintiff reported that she was experiencing migraine headaches. (Tr. 341). The results of an examination were unremarkable. (Tr. 341). Hogan observed that Plaintiff was "doing fine" and "appears not to be in any pain." (Tr. 341). Plaintiff reported that "in the past" when she experienced headaches she would go to the emergency room and receive an injection of Demerol[1] or Toradol.[2] (Tr. 341). Plaintiff indicated that she expected Hogan to do the same. (Tr. 341). Hogan declined and instead prescribed Fioricet.[3] (Tr. 341).

X-rays of Plaintiff's chest, taken March 22, 2003, were "negative." (Tr. 260). On March 23, 2003, Plaintiff participated in a cardiac stress test, the results of which were unremarkable. (Tr. 255-56). On March 24, 2003, Plaintiff participated in a coronary arteriogram, the results of which were likewise unremarkable. (Tr. 253-54). On April 18, 2003, Plaintiff participated in a CT scan of her brain, the results of which were "normal." (Tr. 288).

On July 8, 2003, Plaintiff was examined by Dr. Pelkey. (Tr. 312-14). Plaintiff reported that she was experiencing "worsening headaches." (Tr. 314). The results of an examination were unremarkable and Plaintiff appeared to be in no distress. (Tr. 314). Plaintiff's medication regimen was modified. (Tr. 312). Treatment notes dated November 25, 2003, indicate

---

[1] Demerol is a narcotic pain reliever, similar to morphine, used to treat moderate to severe pain. *See* Demerol, available at http://www.drugs.com/demerol.html (last visited on July 29, 2009).

[2] Toradol is a nonsteroidal anti-inflammatory medication used "for the short-term treatment of moderate to severe pain in adults, usually after surgery." *See* Toradol, available at http://toradol.org/ (last visited July 29, 2009). Toradol "should not be used for mild or ongoing painful conditions." *Id.*

[3] Fioricet is a medication, containing acetaminophen, butalbital, and caffeine, used to treat tension headaches caused by muscle contractions. *See* Fioricet, available at http://www.drugs.com/fioricet.html (last visited July 28, 2009).

that Plaintiff's headaches and weakness "have markedly improved." (Tr. 305). Treatment notes dated March 30, 2004, reiterate that Plaintiff's headache symptoms were "improved." (Tr. 302).

On March 31, 2004, Plaintiff participated in an MRI examination of her right knee, the results of which revealed "a small joint effusion," with no evidence of a meniscal, ligament, cartilage, or signal abnormality. (Tr. 293).

On June 15, 2004, Plaintiff reported to the emergency room complaining of migraine headaches. (Tr. 370-72). Plaintiff reported that she was treated in the "urgent care" clinic the previous day where she received a shot of Toradol and other medication. (Tr. 370). Romberg testing[4] was negative and Plaintiff exhibited no evidence of neurological or sensory impairment. (Tr. 370). Plaintiff exhibited 5/5 muscle strength "throughout" and "good" range of motion in her cervical spine. (Tr. 370). A CT scan of Plaintiff's head was "normal." (Tr. 376). Plaintiff was given Toradol after which she reported that she was "pain-free." (Tr. 370).

On August 28, 2004, Plaintiff completed a report concerning her activities. (Tr. 170-76). Plaintiff reported that her activities include washing laundry, cleaning her house, driving, shopping, and walking. (Tr. 170-76). Plaintiff also reported that she provides "adult care" for her mother on a daily basis. (Tr. 170).

Treatment notes dated September 22, 2004, indicate that Plaintiff's migraine symptoms were controlled with medication. (Tr. 390).

X-rays of Plaintiff's knees, taken on September 29, 2004, revealed "mild" patellar spurring, but no evidence of any other bone or joint abnormality. (Tr. 452).

---

[4] Romberg test is a neurological test designed to detect poor balance. *See* Romberg Test, available at http://www.mult-sclerosis.org/RombergTest.html (last visited on July 29, 2009). The patient stands with her feet together and eyes closed. The examiner will then push her slightly to determine whether she is able to compensate and regain her posture. *Id.*

On September 30, 2004, Plaintiff was examined by Physician's Assistant Hogan. (Tr. 389). Plaintiff reported that she was experiencing migraine headaches and wanted a shot of Demerol. (Tr. 389). Plaintiff reported that she "keeps the lights off at home" because of her migraine headaches. (Tr. 389). Hogan observed, however, that the "bright" lights in the examination room "don't seem to be bothering" Plaintiff. (Tr. 389). Hogan further observed that Plaintiff did not appear to be experiencing any distress or discomfort. (Tr. 389). The results of an examination were unremarkable. (Tr. 389). Hogan informed Plaintiff that "we do not have Demerol here," at which point Plaintiff requested (and received) an injection of Toradol. (Tr. 389).

On October 6, 2004, Plaintiff participated in a mental health outpatient initial assessment. (Tr. 428-35). Plaintiff reported that she was experiencing depression. (Tr. 428). Plaintiff appeared sad, but the results of a mental status examination were otherwise unremarkable. (Tr. 431-33). Plaintiff was diagnosed with major depression and her GAF score was rated as 55.[5] (Tr. 433). Treatment notes dated October 21, 2004, indicate that Plaintiff "never returned for treatment." (Tr. 434-35).

On December 29, 2004, Plaintiff participated in a cardiac stress test, the results of which were "normal." (Tr. 515).

On February 9, 2005, Plaintiff participated in a consultive examination, conducted by Thomas Spahn, Ed.D. (Tr. 457-60). Plaintiff reported that she was unable to work due to various physical ailments. (Tr. 457). Plaintiff also reported that she was "sad." (Tr. 457). Plaintiff appeared moderately depressed, but the results of a mental status examination were otherwise

---

[5] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 1994) (hereinafter DSM-IV). A GAF score of 55 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning." DSM-IV at 34.

unremarkable. (Tr. 458-60). Plaintiff was diagnosed with adjustment reaction with depressed mood and her GAF score was rated as 52. (Tr. 460). Dr. Spahn further observed that Plaintiff exhibited a "lack of severe psychopathology." (Tr. 460).

On March 8, 2005, Dr. W. B. Van Houten completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations. (Tr. 471-84). The doctor concluded that Plaintiff satisfied the Part A criteria for Section 12.02 (Organic Mental Disorders) and Section 12.04 (Affective Disorders) of the Listing of Impairments. (Tr. 472-80). The doctor determined, however, that Plaintiff failed to satisfy any of the Part B criteria for these particular Listings. (Tr. 481). Specifically, the doctor concluded that Plaintiff experienced mild restrictions in the activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and never experienced episodes of decompensation. (Tr. 481).

Dr. Van Houten also completed a Mental Residual Functional Capacity Assessment form regarding Plaintiff's limitations in 20 separate categories encompassing (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation. (Tr. 485-86). Plaintiff's abilities were characterized as "moderately limited" in three categories. (Tr. 485-86). With respect to the remaining 17 categories, the doctor reported that Plaintiff was "not significantly limited." (Tr. 485-86).

On April 12, 2005, Plaintiff was examined by Dr. Pelkey. (Tr. 510). Plaintiff reported that she was experiencing arthritis in her knees, back, hands, elbows, and neck. (Tr. 510). The results of an examination were unremarkable. (Tr. 510). X-rays of Plaintiff's thoracic spine revealed "minimal" degenerative changes, but were otherwise "normal." (Tr. 531). X-rays of

Plaintiff's right hand were "negative for evidence of osseous pathology." (Tr. 531). Plaintiff was instructed to engage in regular exercise, eat a healthy diet, and get plenty of rest. (Tr. 510).

X-rays of Plaintiff's hands, taken on June 29, 2005, revealed no evidence of fractures, dislocations, arthritis, or bone destruction. (Tr. 529).

On August 2, 2005, Plaintiff was examined by Dr. Pelkey. (Tr. 505). Plaintiff reported that she was experiencing "chronic headaches." (Tr. 505). The doctor modified Plaintiff's medication regimen and scheduled her to participate in a CT scan. (Tr. 505). On August 4, 2005, Plaintiff participated in a CT scan of her head, the results of which revealed "mild prominence of the ventricular system," with no evidence of lesion or obstruction. (Tr. 527).

On January 27, 2006, Plaintiff participated in an MRI examination of her thoracic spine, the results of which revealed no evidence of abnormality. (Tr. 526).

On February 23, 2006, Plaintiff was examined by Dr. Terrence Emiley. (Tr. 611). Plaintiff reported that she was developing a soft tissue mass on the bottom of her left foot that was causing her a lot of discomfort. (Tr. 611). This was subsequently diagnosed as a plantar fibroma, for which Plaintiff was prescribed a shoe pad. (Tr. 616-17).

On March 9, 2006, Plaintiff participated in a psychological assessment, conducted by Mary-Catherine Kane, M.A. and Eric Sauer, Ph.D. (Tr. 828-33). Plaintiff participated in the Beck Depression Inventory and the Beck Hopelessness Scale, the results of which corresponded with the "minimal range of depression" and "mild range of hopelessness." (Tr. 831). Plaintiff participated in intelligence testing, the results of which revealed that she possesses a verbal IQ of 72, a performance IQ of 81, and a full scale IQ of 75. (Tr. 831). Plaintiff was diagnosed with

9

depressive disorder and borderline intellectual functioning and her GAF score was rated as 65. (Tr. 833).

On April 11, 2006, Plaintiff was examined by Dr. Pelkey. (Tr. 626). Plaintiff reported that she was experiencing chronic back pain. (Tr. 626). Plaintiff reported that her back pain improves with massage and heat. (Tr. 626). The doctor modified Plaintiff's medication regimen and instructed her to continue treating her back with heat, ice, and massage. (Tr. 626). X-rays of Plaintiff's lumbar spine, taken April 19, 2006, revealed "minimal" degenerative changes, but were otherwise "normal." (Tr. 633). X-rays of Plaintiff's chest and abdomen, taken June 14, 2006, revealed no evidence of abnormality. (Tr. 632).

On August 8, 2006, Plaintiff participated in an MRI examination of her lumbar spine, the results of which revealed "minor dehydration of the L5-S1 disks," but were "otherwise normal." (Tr. 631). X-rays of Plaintiff's chest, taken September 14, 2006, revealed no evidence of acute cardiopulmonary abnormality. (Tr. 630).

During a September 19, 2006 examination of her knees, Plaintiff reported that she can stand for 45 minutes at one time. (Tr. 621).

On December 13, 2006, Plaintiff was examined by Dr. Matthew Boyd. (Tr. 636). Plaintiff reported that she was experiencing chronic knee pain that responded to medication. (Tr. 636). An examination of Plaintiff's knees revealed "some mild medial joint line tenderness," as well as decreased range of motion in Plaintiff's right knee. (Tr. 636). However, there was no evidence of effusion or laxity and Lachman's test[6] was negative. (Tr. 636). Plaintiff was diagnosed with

---

[6] Lachman's test is used to determine whether a patient has suffered a tear of the anterior cruciate ligament. *See*, *e.g.,* Lachman's Test on Normal Knee, available at, http://www.mayoclinic.com/health/acl-injury/MM00269 (last visited on July 29, 2009); Lachman's Test, available at http://www.fpnotebook.com/Ortho/Exam/LchmnTst.htm (last visited on July 29, 2009).

bilateral patellofemoral syndrome. (Tr. 636). She was instructed to perform a series of home exercises and take Tylenol or Motrin as needed. (Tr. 636).

On May 10, 2007, Plaintiff was examined by Dr. Emiley concerning her foot difficulties. (Tr. 859). Plaintiff reported that her foot hurts "any time she is on it for any period of time." (Tr. 859). In a May 23, 2007 letter, Dr. Emiley noted that Plaintiff's plantar fibromas were "not in a direct weightbearing area but more so are in the arch." (Tr. 853). The doctor concluded that Plaintiff's ability to be active was limited by her need for a sit-stand option. (Tr. 853).

At the June 28, 2007 administrative hearing, Plaintiff testified that she was presently working part-time as a paid care provider for her mother. (Tr. 939). Plaintiff reported that she takes her mother to appointments, runs errands for her mother, cleans her mother's house, and washes her laundry. (Tr. 939). Plaintiff reported that she had been performing this work since 2002. (Tr. 941).

## ANALYSIS OF THE ALJ'S DECISION

### A. Applicable Standards

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[7] If the Commissioner can make a

---

[7] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can

11

dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

## B. The ALJ's Decision

The ALJ determined that Plaintiff suffered from the following severe impairments: (1) mild osteoarthritis of the knees; (2) bilateral plantar fibroma; (3) migraine headaches; and (4) depression. (Tr. 18). The ALJ further determined, however, that these impairments, whether considered alone or in combination, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 18-24). The ALJ concluded that while Plaintiff was unable to perform her past relevant work, there existed a significant number of jobs which she could perform despite her limitations. (Tr. 24-29). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

### 1. The ALJ's Decision is Supported by Substantial Evidence

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience,

---

be performed (20 C.F.R. 404.1520(f)).

perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

As noted above, the Commissioner has established a five-step disability determination procedure. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform work subject to the following limitations: (1) she can lift/carry 20 pounds occasionally and 10 pounds frequently; (2) she can stand and/or walk six hours during an 8-hour workday; (3) she must be able to sit or stand at her option; and (4) she can perform only simple, unskilled tasks. (Tr. 24). After reviewing the relevant medical evidence, the Court concludes that the ALJ's determination as to Plaintiff's RFC is supported by substantial evidence.

The ALJ determined that Plaintiff was unable to perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant

13

can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Paul Delmar.

The vocational expert testified that there existed approximately 12,000 jobs in the state of Michigan which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 958-60). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988).


a. The ALJ Properly Evaluated the Medical Evidence

Plaintiff argues that the ALJ failed to accord sufficient weight to the opinions expressed by several of her care providers.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and her maladies generally possess significant insight into her medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). Accordingly, the medical opinions and diagnoses of treating physicians are given substantial deference, and if such opinions and diagnoses are uncontradicted, complete deference is appropriate. *See King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984).

Nonetheless, the ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991

WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

When an ALJ chooses to accord less than controlling weight to the opinion of a treating physician, he must adequately articulate his rationale for doing so. *See Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544-47 (6th Cir. 2004). As the *Wilson* court held:

> If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors - namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source - in determining what weight to give the opinion.
>
> Importantly for this case, the regulation also contains a clear procedural requirement: "We will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion." A Social Security Ruling explains that, pursuant to this provision, a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."

*Id.* at 544 (internal citations omitted).

As the *Wilson* court further held, failure to comply with this requirement is not subject to harmless error analysis. *Id.* at 546-47. As the court expressly stated:

> A court cannot excuse the denial of a mandatory procedural protection simply because, as the Commissioner urges, there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely. . .To hold otherwise, and to recognize substantial evidence as a defense to non-compliance with § 1527(d)(2), would afford the

15

> Commissioner the ability [to] violate the regulation with impunity and render the protections promised therein illusory.

*Id.* at 546 (internal citations omitted).

1. Dr. Gary Bailey

On May 22, 2007, Plaintiff's counsel obtained a sworn statement from Dr. Bailey concerning Plaintiff's condition. (Tr. 868-79). Dr. Bailey indicated that he examined Plaintiff on only one occasion, the day prior to providing his sworn statement. (Tr. 871). The doctor stated that due to the foot difficulties she was experiencing, Plaintiff would require a job with a sit/stand option. (Tr. 871-73). Dr. Bailey stated that when he examined Plaintiff he observed no evidence that Plaintiff was experiencing muscle spasms in her back. (Tr. 873-74). The doctor also reported that Plaintiff's knees "look pretty normal." (Tr. 873). The doctor reported that Plaintiff would likely experience difficulty concentrating. (Tr. 874-75). Dr. Bailey concluded that Plaintiff was unable to work on a full-time basis. (Tr. 875-76).

First, because Dr. Bailey examined Plaintiff on only one occasion his opinion is entitled to no special deference. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994); *Atterberry v. Secretary of Health and Human Services*, 871 F.2d 567, 571-72 (6th Cir. 1989). The ALJ nonetheless evaluated Dr. Bailey's statement and afforded it "little weight." (Tr. 30). As the ALJ correctly observed, the doctor's opinion that Plaintiff was incapable of maintaining full-time employment was based on Plaintiff's "subjective report of pain and other symptoms." (Tr. 30). The ALJ further observed that the only "work restriction" Dr. Bailey articulated, *that was based on the results of his examination of Plaintiff*, was his conclusion that Plaintiff required a sit-stand option. (Tr. 30). The ALJ incorporated this limitation into his RFC determination. The ALJ's determination to afford less than controlling weight to Dr. Bailey's opinion is supported by substantial evidence.

2. Dr. Emiley

As noted above, in a May 23, 2007 letter, Dr. Emiley reported that Plaintiff's ability to work was limited by her need for a sit-stand option. Plaintiff asserts that the ALJ failed to afford sufficient weight to Dr. Emiley's opinion. The Court fails to discern the nature of Plaintiff's objection, as the ALJ included in his RFC determination the limitation that Plaintiff requires the ability to sit or stand at her option. This argument is without merit.

3. Dr. Pelkey and Physician's Assistant Hogan

On May 29, 2007, Dr. Pelkey and Mr. Hogan executed identical sworn statements concerning Plaintiff's ability to work. (Tr. 861-66). Both care providers stated that Plaintiff suffers from chronic pain and depression which limit her ability to concentrate and maintain pace. (Tr. 862, 865). They reported that Plaintiff requires a sit-stand option, as well as "frequent breaks." (Tr. 862, 865). These care providers concluded that Plaintiff "would, more likely than not, be unable to maintain an 8-hour per day, 40-hour per week job." (Tr. 862, 865). Plaintiff faults the ALJ for failing to accord controlling weight to these opinions.

The ALJ considered these statements and determined that such were of little value. (Tr. 30). As the ALJ concluded:

> The statements from Dr. Pelkey and Mr. Hogan, prepared by the claimant's attorney, are identical and reflect their opinion that the claimant is unable to perform full-time work activity due to the symptoms she experiences from her migraine headaches and the arthritis affecting her knees, low back, neck, in addition to her depression. The undersigned notes that neither statement contains references to any objective evidence to support their conclusions. . .The opinions offered by Dr. Pelkey and Mr. Hogan, particularly, appear to be based upon the claimant's subjective complaints and are not supported by their own treatment records. Therefore, while the

18

> undersigned has considered the conclusory statements of these medical sources, greater weight is accorded to the record as a whole which shows a capacity by the claimant to perform work activity.

(Tr. 30).

As the discussion of the administrative record above demonstrates, the ALJ's assessment of the opinions expressed by Dr. Pelkey and Mr. Hogan are supported by substantial evidence.

### b. The ALJ Properly Relied on the Vocational Expert's Testimony

Plaintiff asserts that the ALJ relied upon the response to an inaccurate hypothetical question. While the ALJ may satisfy his burden through the use of hypothetical questions posed to a vocational expert, such hypothetical questions must accurately portray the claimant's physical and mental impairments. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150 (6th Cir. 1996).

The hypothetical question which the ALJ posed to the vocational expert simply asked whether there existed jobs which an individual could perform consistent with Plaintiff's limitations, to which the vocational expert indicated that there existed approximately 12,000 such jobs. Because there was nothing improper or incomplete about the hypothetical questions he posed to the vocational expert, the ALJ properly relied upon his response thereto.

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence. Accordingly, the undersigned recommends that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date: July 29, 2009                     /s/ Ellen S. Carmody
                                        ELLEN S. CARMODY
                                        United States Magistrate Judge